**Opinion issued April 9, 2026.**



In the

# Court of Appeals

for the

# First District of Texas

_____

## NO. 01-25-00924-CV

_____

## IN THE INTEREST OF T.R. AND R.R., CHILDREN

---

**On Appeal from the 306th District Court**
**Galveston County, Texas**
**Trial Court Case No. 24-CP-0006**

---

## OPINION

Appellants K.B. (Mother) and A.R. (Father) appeal the trial court's order terminating their parent-child relationship with "Timothy" and "Richard" and

appointing the Department of Family and Protective Services (the Department) as sole managing conservator of both children.[1]

Mother contends: (1) the trial court failed to commence trial on the merits within the time period required by section 263.401 of the Texas Family Code, depriving the trial court of jurisdiction; (2) the evidence is legally and factually insufficient to support the trial court's finding that termination is in the children's best interest; (3) the evidence is legally and factually insufficient to support the trial court's finding that denial of the Department's request to be permanent managing conservator would significantly impair the children's physical health or emotional development; and (4) the evidence is legally and factually insufficient to support the trial court's findings under section 161.001(f) of the Texas Family Code.

Father contends: (1) the trial court failed to commence trial on the merits within the time period required by section 263.401 of the Texas Family Code, depriving the trial court of jurisdiction; (2) he was denied effective assistance of counsel; (3) the evidence is legally and factually insufficient to support the trial court's predicate findings for termination under section 161.001(b) of the Texas Family Code; (4) the evidence is legally and factually insufficient to support the trial court's findings under section 161.001(f) of the Texas Family Code; (5) the evidence

---

[1] To protect the identity of the parties, we refer to them by fictious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

2

is legally and factually insufficient to support the trial court's best-interest findings; and (6) termination of the parent-child relationship in this case does not satisfy strict scrutiny under the Texas Constitution.

With respect to both parents, we conclude that the trial court timely commenced the trial on the merits and the evidence is legally and factually sufficient to support the trial court's order terminating Mother's and Father's parent-child relationships with both children. We further conclude that Father was not denied effective assistance of counsel. Regarding Father's constitutional challenge, assuming this issue was preserved for our review, we conclude that existing protections applicable to parental-rights termination suits sufficiently safeguarded Father's constitutional rights, and we overrule this issue. We affirm the trial court's order terminating Mother's and Father's parental rights to the children and appointing the Department permanent managing conservator.

## Background

This appeal concerns two siblings: Timothy and Richard. At the start of trial, Timothy was eleven years old, and Richard was five years old.

### A. Children's Removal

Cali Redding, an investigation supervisor for the Department, testified that the Department began its investigation into the children following reports of neglectful supervision and physical abuse and a concern that the family was living out of a

vehicle. The Department opened a case after law enforcement responded to a domestic violence incident between Mother and Father. There was also a report that Father had punched Timothy in the back. Redding further testified that law enforcement found methamphetamine in the family's vehicle.

Redding first located Timothy and Richard at their paternal grandmother's home. Law enforcement had taken the children there, discovered a pending case opened by the Department, and contacted Redding. When Redding went to the grandmother's home, Mother and Father were not present. She spoke with Timothy, but Richard was not "verbally appropriate" at the time. Timothy made several "outcries" to Redding, including drug use by Mother and Father and domestic violence. He confirmed that the family was living out of their car and said there were times when Father had hit him. Timothy said he did not feel safe with Father and did not think Father loved him.

As Redding concluded the interview with Timothy, Father appeared. She confronted him regarding the drug-use and domestic-violence allegations. He admitted historical drug use but denied any current use of methamphetamine or cocaine. He also said that the methamphetamine found in the car by law enforcement belonged to Mother, not him. He admitted fighting with Mother and breaking a windshield in anger.

Redding asked Father to appear for a drug test, and he agreed to do so. A few days later, but before the drug test, Father sent a text message to Redding correcting his prior statement regarding present drug use. He informed her that he believed his test would come back positive for methamphetamine. For his first drug test, Father tested positive for amphetamine and methamphetamine.

Redding attempted to locate Mother. She called a phone number that Father provided. She also contracted a special investigator to locate Mother without success. Redding went to locations that the parents frequented, including a McDonald's and Dollar General in the Texas City area. She also searched online for addresses and phone numbers associated with Mother and reached out to relatives. Redding eventually deferred to communicating messages to Mother through Father.

At some point, the paternal grandmother no longer wanted to care for Timothy and Richard, so the Department sought removal of the children. On January 31, 2024, the trial court appointed the Department as the children's temporary sole managing conservator. That same day, the trial court set an adversary hearing for February 8, 2024. Redding attempted to place Timothy and Richard with a paternal grandfather and a paternal great aunt, but neither wanted to take the children. The Department placed the children in an emergency shelter and then in a foster home. At the time of trial, the children were still in the foster home, and the Department stated its intention of unrelated adoption.

**B.    Subsequent Proceedings**

On February 8, 2024, the trial court held an adversary hearing as required by section 262.201 of the Texas Family Code. TEX. FAM. CODE § 262.201. Mother and Father appeared with their counsel. The following day, the trial court entered a temporary order appointing the Department as temporary managing conservator of the children. On March 22, 2024, counsel for the Department served on all parties copies of the service plans for Mother and Father. *See* TEX. FAM. CODE § 263.101 (requiring the Department to file a service plan). On April 1, 2024, the trial court issued an order approving the service plans and giving them effect despite the fact that neither parent had signed his or her service plan. *See id.* § 263.103(d) ("The original service plan takes effect when . . . the court issues an order giving effect to the plan without the parents' signatures.").

On November 7, 2024, the trial court held a permanency hearing as required by section 263.304 of the Texas Family Code. TEX. FAM. CODE § 263.304. Following that hearing, the trial court found that Mother had demonstrated adequate and appropriate compliance with the service plan but that Father had not.

On February 20, 2025, the trial court held a subsequent permanency hearing as required by section 263.305 of the Texas Family Code. TEX. FAM. CODE § 263.305. Following that hearing, the trial court again found that Mother had

6

demonstrated adequate and appropriate compliance with the service plan but that Father had not.

On June 12, 2025, the trial court held another permanency hearing as required by section 263.305 of the Texas Family Code. *Id.* The trial court found that Mother had partially demonstrated adequate and appropriate compliance with the service plan and that Father had not demonstrated adequate and appropriate compliance with the service plan.

## C.    Trial

On July 21, 2025, counsel for Mother, Father, and the Department appeared before the trial court. The attorney *ad litem* for the children also appeared. The Department announced ready for trial. The trial court briefly heard testimony from Cali Redding, the investigation supervisor, and continued the trial to September 25, 2025.

### 1.    Forensic interviewer

On the second day of trial, September 25, 2025, the trial court heard testimony from Kim Keever. Keever is a forensic interviewer at the Advocacy Center for Children of Galveston County. She has 15 years of experience. Keever interviewed Timothy in January 2024 and June 2025. In the first interview, he reported drug use by both parents and physical abuse by Father. He also witnessed both parents having sex, but he did not report any other sexual abuse. He told Keever that Father hit and

punched him. On another occasion, Father lit the family's car on fire. He said that both parents used drugs he called "H" and "ice." He said Mother took him and his brother to drug houses where Mother would spend all the family's money on drugs instead of buying food. Keever testified that Timothy could differentiate between a truth and a lie.

In the June 2025 interview, according to Keever, Timothy confirmed his prior statements regarding drug use and physical abuse. Timothy also disclosed that Father had sex with him and Richard. He told Keever that Father "put his wiener in his butt" while Mother was stealing from a gas station. He also saw Father and Mother "using their bodies for sex" in exchange for drugs. The parents would have sex with truck drivers and leave the doors open, allowing the children to see their parents having sex. The family was living out of a car and would park on the side of the road or at a gas station. Timothy also said that, when Father hit him, Mother was present and did not stop the abuse.

When asked whether Timothy made any specific allegations of abuse by Mother, Keever testified that, in the June 2025 interview, Timothy said Mother would hit him. He said there was "a lot more" he wanted to tell Keever, but he did not want to be late for his scheduled visit with Mother.

### 2. Sherrif's deputy

The Department next called Ira Fowler. Fowler is a sergeant in the street crimes unit of the Galveston County Sherrif's Office. In early 2025, Fowler arrested Father pursuant to an arrest warrant for sexual assault of a child. After being arrested, Father asked to call Mother, and Fowler allowed Father to call using Fowler's phone. On the call, Father told Mother he was being arrested. Mother asked Father that he not speak to anyone else or tell anyone that she spoke with him. The call lasted roughly a minute.

### 3. Caseworker

Kamiia Warren is a caseworker for the Department. She has been the children's caseworker since December 2024. Prior to Warren's assignment to the case, the Department created a service plan for each parent. The original goal of the service plans was family reunification. Warren's testimony focused on each parent's compliance with the service plans, the parents' circumstances at the time of trial, the Department's efforts to return the children, and the basis for the Department seeking termination of parental rights.

Father did not complete any services under his service plan. Father last completed a drug test on March 27, 2024, more than a year before trial. He tested positive for methamphetamine, amphetamine, and marijuana. Warren testified that the sexual abuse allegations against Father concerned the Department, the

9

Department made reasonable efforts to reunify the children with Father, Father has failed to address the reasons that resulted in the Department's custody of the children, and there is a continuing danger should the children be returned to Father.

Mother completed an inpatient program at Santa Maria from July to October 2024. At the time of trial, Mother lived at Oxford House, which Mother described to Warren as a self-run sober-living facility. Mother told Warren that Oxford House has no staff or managers. At the time of trial, Mother was still engaging with substance abuse treatment, attending groups and classes.

Mother last completed a drug test in May 2025. Prior to May 2025, Mother submitted to random drug tests, all of which reported negative for each tested substance. Mother completed nine drug tests from October 2024 through May 2025. Following Mother's last drug test in May 2025, Warren asked Mother multiple times a month to complete a drug test. Mother had also been bleaching and dying her hair, which interferes with taking hair follicle samples for drug tests. Regarding her services, Mother completed a psychiatric evaluation and followed the recommendations from that evaluation. She completed a domestic violence course. Mother started but did not complete a protective parenting course. Mother completed all of her services except for the protective parenting class. The course was virtual and telephonic, and Mother never reported difficulty maintaining a phone or Internet access.

Warren testified regarding her concerns about Mother's lack of protectiveness, which was the impetus for the protective parenting course. When Warren confronted Mother about the sex-abuse allegations against Father, Mother responded that she did not think Father would do that. Warren was concerned that Mother did not believe the children. When confronted by Warren, Mother denied speaking with Father, but Warren witnessed Father speak with Mother on the phone in July 2025. Warren also viewed bodycam footage from Father's arrest showing his call with Mother. When Father and Mother spoke while Father was being arrested, they both said "I love you" to each other.

Warren also testified to the children's therapy sessions. In a September 28, 2024 therapy session, Timothy told his therapist that he did not want to return to Mother and did not want to visit her anymore. He said that Mother told him to destroy his foster mother's home and that "Black people were abusers." Prior to this therapy session, Mother had met with the children in an unsupervised visit. The children did not report any of these details to Warren, who picked them up from this visit. There have never been therapy sessions with the family meeting as a whole.

Warren testified regarding the parents' living conditions. Father would not allow Warren to come to his residence. Warren met with Father in July 2025. He was not working at the time. This was Warren's only meeting with father. The children were not open to visiting Father, and he had not seen the children since

11

February 2024. As for Mother, at the time of trial, she had recently moved from her previous residence due to budget cuts. At her new residence, Oxford House, Mother is not allowed to have children with her.

As part of her regular visitations, Mother met with Timothy and Richard one to two times per month at her residence. Warren testified that the visits "go really good." However, on one occasion, Christmas Eve, Mother fed the children sugary sweets despite Richard's extensive dental decay.

Warren testified that she believed termination of parental rights was in the children's best interest because the Department is concerned about Mother's lack of protectiveness around the children and continued communications with Father. With respect to Father, Warren testified that termination was in the children's best interest because Father had not completed any services. Warren could not identify any relatives willing or able to take the children.

### 4.    Father

Father said he tried to complete the services, but he did not have a phone. He testified that, at the time of trial, he had been sober for six months, but he acknowledged prior use of methamphetamine. Father said he attends Narcotics Anonymous and has a sponsor.

### 5. Mother

At trial, Mother acknowledged her prior drug use. She said she used heroin. She testified that she has been sober since July 17, 2024, and that she attends Narcotics Anonymous and Alcoholics Anonymous. She acknowledged that Father is one of her "triggers," and she testified that she does not communicate with him. Mother was concerned that Father was not completing his services. She believed he was a danger to the children. She believed the children needed to be protected from him, and she stated that she plans to keep them away from him.

From October 28, 2023, to February 21, 2024, Mother lived at House of Extra Measures. She moved from House of Extra Measures to Paschall House because the latter would allow children. When Mother moved from House of Extra Measures to Paschall House, she testified that her drug testing center did not change, and she had difficulty with transportation to that location from her new home. Mother eventually left Paschall House because it was closing due to funding cuts.

On August 21, 2025, roughly one month before the second day of trial, Mother moved from Paschall House to Oxford House, her home at the time of trial. Oxford House does not allow children, but she was aware of other homes that allow children and have available space. She had been looking into vacancies at those other homes. She testified that her current home does random drug testing by urinalysis, but she has not been drug tested in the month since living there.

13

Mother acknowledged that she did not complete the protective parenting course as part of her service plan. She was discharged from the course because she had missed four sessions. According to Mother, she had to reschedule those sessions due to her work schedule and was unaware that rescheduling was grounds for being discharged from the course.

Mother testified that, if the children were returned to her, she would not have further contact with Father. Mother testified that she believes the boys were sexually abused by Father. She testified that she would take the children to their medical and dental appointments, but she did not know of a specific doctor or dentist.

### 6. Court-appointed special advocate

Johnny Cooper is a court-appointed special advocate for the children. He has been an advocate on the case since February 16, 2024. He had monthly visits with Timothy and Richard. He testified that they have been doing well in foster care. When Timothy started school, he was making *D*s but improved to *A*s and *B*s by the time of trial.

Cooper observed two visits between Mother and the children and testified that they "went pretty well." He had not observed any visits in 2025. Cooper agreed with the Department's request for termination of parental rights. The children told Cooper that they enjoy the visits with Mother, but they do not want to return to her. Cooper testified that the children told him that they do not want to endure physical or sexual

14

abuse or go hungry and that they want to stay in school and have a place to live. Cooper understood that "terminating parental rights is death penalty" and still believed it was in the children's best interest.

## D. Interview with Child

On September 23, 2025, Father's trial counsel and the children's attorney *ad litem* jointly filed a motion requesting that the court confer with the children in chambers. On September 25, 2025, after the close of trial, the trial court raised the matter of interviewing the eldest child, Timothy, only. The trial court asked whether any party wanted a record of the interview, and all parties declined. Following trial, the trial court interviewed Timothy in chambers, and no record was prepared.[2]

## E. Termination Order

On October 9, 2025, the trial court rendered its ruling, terminating the parent-child relationship between the children and Mother and Father and appointing the

---

[2] When, as here, the interviewed child is under the age of 12, the Texas Family Code does not require that a record be made of the interview. *See* TEX. FAM. CODE § 153.009(f) (requiring that, on motion or *sua sponte*, "the court shall cause a record of the interview to be made when the child is 12 years of age or older" and that "record of the interview shall be part of the record in the case"). Because no record was prepared nor was one required, "we need not presume that facts existed" that support the trial court's judgment. *See Forbes v. Wettman*, 598 S.W.2d 231, 232 (Tex. 1980) (holding that children's unsworn statements in interview with court would not be presumed to support trial court's denial of writ of habeas corpus in custody dispute); *cf. In re Lau*, 89 S.W.3d 757, 760-61 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (presuming facts existed from off-record interview that supported trial court's findings where children were over age of 12 and, thus, the Texas Family Code required a record, but parties failed to request one).

Department managing conservator of the children. On October 31, 2025, the trial court entered its order of termination. In that order, the trial court found, by clear and convincing evidence, that the Department made reasonable efforts to return the children to Mother and Father but that a continuing danger in the home prevented their return. The trial court further found by clear and convincing evidence that both parents (1) "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children" and (2) "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children." *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E). The trial court also found that termination of the parent-child relationship was in the children's best interest as to both Mother and Father.

**Commencement of Trial on the Merits**

In their first issues, Mother and Father contend that the trial court failed to commence trial on the merits within the time required by section 263.401(a), which provides as follows:

> Unless the court has commenced the trial on the merits or granted an extension . . . , on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order. Not later than the 60th

16

> day before the day the suit is automatically dismissed, the court shall notify all parties to the suit of the automatic dismissal date.

TEX. FAM. CODE § 263.401(a). The trial court first appointed the Department as temporary managing conservator on January 31, 2024. The Monday following the one-year anniversary of that date was February 3, 2025. On November 12, 2024, the trial court entered an order under section 263.401(b) of the Texas Family Code, extending the automatic dismissal date by 180 days to August 2, 2025. TEX. FAM. CODE § 263.401(b). Neither Mother nor Father challenges the propriety of that order. However, they both contend that the trial on the merits did not commence until September 25, 2025, well after the August 2, 2025 deadline. They argue that the first purported day of trial on July 21, 2025, was a "sham" designed to circumvent automatic dismissal under section 263.401.

Whether a trial court has subject-matter jurisdiction is a question of law that we review de novo. *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (citing *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013)). In determining whether trial on the merits commenced under section 263.401 of the Texas Family Code, courts have considered whether "(a) preliminary matters were addressed, (b) the parties announced 'ready,' (c) opening statements were made, (d) witnesses were sworn, (e) a party called a witness to testify, and (f) exhibits were admitted." *In re J.L.J.*, 645 S.W.3d 294, 296 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (citation modified) (collecting cases); *see In re R.J.*,

17

579 S.W.3d 97, 109 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (considering whether parties announced "ready," witnesses were sworn, and trial court heard testimony). Courts have also considered whether trial was called on the date recited in the final order. *J.L.J.*, 645 S.W.3d at 295 (citing *In re N.F.*, No. 09-19-00435-CV, 2020 WL 2070286, at *15 (Tex. App.—Beaumont Apr. 30, 2020, pet. denied) (mem. op.)).

Here, the trial court's June 18, 2025 "Permanency Hearing Order Before Final Order" set trial on the merits for June 23, 2025. On June 23, 2025, the Department's counsel filed a "Notice of Trial Setting," setting trial on the merits for July 21, 2025. On July 21, 2025, counsel for the Department announced ready for trial, and no other counsel objected to proceeding with trial. Prior to that day, the Department's counsel circulated exhibits. The record is unclear whether any exhibits were admitted that day, but none was introduced. The Department called its first witness, Cali Redding. Redding was sworn, the Department completed its direct examination, and all other counsel reserved their questions for the next day of trial. Mother and Father point to evidence in the record that the parties did not intend to try the case on July 21, 2025. On the docket sheet, a July 11, 2025 "Judge's Notes on Hearings and Trials" states: "will need to do a start/stop on 7/21/25." On July 21, 2025, after the parties made their announcements, the Department's counsel stated, "I believe we're going to start and then recess this case . . . ."

18

The courts of appeals have considered and rejected arguments similar to those raised by Mother and Father. *See, e.g.*, *In re Z.S.*, 631 S.W.3d 313, 318-19 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (addressing and rejecting argument that parties' agreement to "start and stop" did not commence trial on that date); *In re R.A.L.*, No. 01-24-00347-CV, 2024 WL 4455599, at *11-12 (Tex. App.—Houston [1st Dist.] Oct. 10, 2024, no pet.) (mem. op.) (addressing and rejecting argument that trial date was "sham" and that brief testimony was not sufficient to commence trial). Nonetheless, Father compares this case to *In re. D.S.*, 455 S.W.3d 750 (Tex. App.—Amarillo 2015, no pet.). In *D.S.*, the court of appeals determined that the trial court failed to commence trial within section 263.401's deadline where (1) the parties never answered whether they were ready for trial; (2) the trial court immediately called counsel for the parties to the bench, inquired as to how long trial would take, and upon receiving an answer, "immediately 'recessed' the hearing and instructed counsel to obtain a subsequent trial date from the court coordinator"; (3) no substantive action was taken regarding the case; and (4) no preliminary matters or motions were heard. *Id.* at 752-53.

Here, unlike in *D.S.*, the Department's counsel circulated exhibits prior to the date trial started, the parties appeared, counsel made their announcements, and witnesses were sworn. The Department called its first witness, who briefly testified. All other counsel were given an opportunity to question the witness but elected to

reserve any cross-examination until trial resumed. We conclude that the record contains sufficient evidence that trial commenced on July 21, 2025, and within section 263.401's deadline.

We overrule each parent's first issue.

## Sufficiency of Evidence for Termination

In a case to terminate parental rights under section 161.001 of the Texas Family Code, the Department must establish that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements—i.e., a statutorily prescribed predicate finding and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

In addition, in suits brought by the Department, as here, courts "may not order termination . . . unless the court finds by clear and convincing evidence" that "the

department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent . . . ." *Id.* § 161.001(f). The court may only dispense with the requirements of subsection (f) if "the court finds that the parent has subjected the child to aggravated circumstances." *Id.* §§ 161.001(f)(2), 262.2015(a).

In his third, fourth, and fifth issues,[3] Father challenges the sufficiency of the evidence to support the trial court's termination of his parental rights under subsections (D) and (E), the trial court's finding that termination is in the children's best interest, and the trial court's reasonable-efforts and continuing-danger findings. In her second and fourth issues, Mother challenges the sufficiency of the evidence to support the trial court's finding that termination is in the children's best interest and the trial court's continuing-danger findings to support termination of her parental rights. She does not challenge the trial court's predicate-ground findings. *See id.* § 161.001(b)(1) (prescribing grounds for termination).

---

[3] We address Father's sufficiency challenges before turning to his second issue— ineffective assistance of counsel—because our determination regarding the sufficiency of the evidence to support termination is interrelated with our determination regarding whether Father was harmed by any ineffective assistance of counsel.

## A.    Standard of Review

When assessing the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the record in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (discussing elevated standard of review in parental termination cases). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.*

In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*; *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (citing *J.F.C.*, 96 S.W.3d at 266).

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.

22

2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B. Predicate Findings Under Subsections (D) and (E)

In Father's third issue, he challenges the factual and legal sufficiency of the evidence to support the trial court's termination of his parental rights under subsections (D) and (E) of section 161.001(b)(1) of the Texas Family Code. TEX. FAM. CODE §§ 161.001(b)(1)(D), (E). Because termination under subsection (D) or (E) may justify termination of parental rights to other children in future cases, we must review both grounds, even though only one ground is sufficient to support termination. *In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024) (citing *In re N.G.*, 577 S.W.3d 230, 235-37 (Tex. 2019); TEX. FAM. CODE § 161.001(b)(1)(M)); *see* TEX. FAM. CODE § 161.001(b)(1)(M) (providing as ground of termination that parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). Whether we affirm or reverse the trial court's judgment on the basis of subsection (D) or (E), due process requires that we detail the analysis of our decision. *N.G.*, 577 S.W.3d at 237.

Section 161.001(b)(1)(D) of the Family Code provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to

remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Because evidence concerning termination under subsections (D) and (E) is interrelated, we may consolidate our examination of the evidence for both grounds. *In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *8 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (citing *In re M.T.W.*, No. 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.); *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.)). "Endanger" is a term used in both subsections (D) and (E). To "endanger" a child means exposing him or her to loss or injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (citing *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer any injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (mem. op.). A parent's

24

conduct that subjects "a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citation modified). The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *In re M.A.J.*, 612 S.W.3d 398, 407 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

Although both subsections (D) and (E) both focus on endangerment, "they differ with regard to the source and proof of endangerment." *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.), *overruled on other grounds by In re L.C.L.*, 599 S.W.3d 79 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc)). Subsection (D) concerns the children's environment, rather than the parent's conduct, although the parent's conduct can affect the children's environment. *Id.* Under subsection (D), "knowingly" does not require that a parent have "certain knowledge that an actual injury is occurring." *In re L.M.M.*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *A.S.*, 261 S.W.3d at 83). Rather, a parent acts "knowingly" when he or she is aware of the potential danger but disregards that risk. *Id.* Under subsection (E), the evidence must show that the endangerment was the result of the parent's conduct, including acts, omissions, or a failure to act. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston

[1st Dist.] 2016, pet. denied). Additionally, under that subsection, courts may consider conduct both before and after the Department removed the child from the home. *In re J.A.R.*, 696 S.W.3d 245, 254 (Tex. App.—Houston [14th Dist.] 2024, pet. denied); *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Here, the Department opened this case after law enforcement responded to a domestic violence incident involving Mother and Father. Law enforcement observed the family living in their vehicle, which the Department's investigation supervisor confirmed after speaking with the eldest child, Timothy. The trial court also heard testimony from the forensic interviewer that Timothy reported his parents leaving him and his brother at drug houses. The trial court also heard testimony from the forensic interviewer and caseworker regarding Timothy's sexual-abuse allegations against Father.

At trial, Father acknowledged prior use of methamphetamine. After the children's removal, he submitted to two drugs tests. On both tests, Father tested positive for amphetamines, and on the second test, he also tested positive for marijuana. Father's second, and final, drug test was on March 27, 2024, roughly 15 months before the first day of trial. Father did not appear for any further testing. He also did not complete any services under his service plan. At the time of trial, Father had not seen either child for well over a year, since February 2024.

26

Father argues that the record does not establish the "where, when, or how" of various allegations, including domestic-violence incidents, drug use, or sexual abuse, and that corroborating evidence was not introduced. However, we "must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence." *R.R.A.*, 687 S.W.3d at 279 n.50 (citing *In re Z.N.*, 602 S.W.3d 541, 548 (Tex. 2020)). Although neither child testified, other witnesses—including an investigation supervisor and caseworker for the Department and a forensic interviewer—testified to statements made by the children, without any objection. Those statements were consistent with each other, and the trial court could have deemed the statements credible. *See In re R.H.W. III*, 542 S.W.3d 724, 734 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Unobjected-to hearsay is, as a matter of law, probative evidence." (citing *Tex. Commerce Bank, N.A. v. New*, 3 S.W.3d 515, 516 (Tex. 1999); TEX. R. EVID. 802)). Rule 802 of the Texas Rules of Evidence does not deprive hearsay statements of probative value merely because they are hearsay. TEX. R. EVID. 802. However, that does not mean that unobjected-to hearsay will always be probative or must be credited by a reviewing court. *See In re D.C.*, No. 05-19-01217-CV, 2020 WL 1042692, at *9 (Tex. App.—Dallas Mar. 4, 2020, pet. denied) (mem. op.) (concluding that hearsay evidence without substantiating details or even the identity of the declarant was not enough to "produc[e] a firm belief or conviction

27

that the allegation is true" (quoting *In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014))). With respect to the hearsay evidence here, multiple witnesses testified to statements that were similar or consistent with one another, and the identities of the declarants were known.

Additionally, the record of Father's post-removal conduct supports the trial court's endangerment finding. *See Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 352-54 (Tex. App.—Austin 2000, no pet.) (concluding that parent's post-removal conduct and failure to utilize Department's services supported endangerment finding). While he testified at trial that he was sober, the trial court could have reasonably disregarded that testimony given his failure to submit to any drug tests in the 15 months preceding the start of trial and his two prior positive tests. Father also did not complete any services, including a parenting-skills course or a substance-abuse assessment. The record supports the trial court's determination that Father has not remedied the endangering conditions that caused the children's removal. Given Father's history of drug use, the family's homelessness at time of removal, evidence of abuse, and Father's lack of improvement, the evidence is legally and factually sufficient to support termination under subsections (D) and (E). *See R.R.A.*, 687 S.W.3d at 281 (concluding evidence was legally sufficient under subsections (D) and (E) where parent had history of drug use, tested positive for illegal substances, refused to appear for drug tests, and disengaged from

"communications, services, and the children themselves"); *In re E.R.W.*, 528 S.W.3d 251, 265-66 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (concluding evidence was legally and factually sufficient under subsection (E) where parent had history of drug use, failed to appear for drug tests throughout case, lacked permanent housing, and was unemployed prior to removal and throughout case); *N.J.H.*, 575 S.W.3d at 832-33 (concluding evidence was legally and factually sufficient under subsection (E) where parent continued drug abuse during case and had history of violence against family); *In re L.E.S.*, 471 S.W.3d 915, 926 (Tex. App.—Texarkana 2015, no pet.) (concluding evidence was legally and factually sufficient under subsection (D) where parent left children with domestic partner who had history of drug abuse and violence).

We overrule Father's third issue.

## C. Statutorily Required Findings

In 2023, the legislature added subsection 161.001(f) to the Texas Family Code, which reads:

> In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
> (1)    the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; or

29

> (2) reasonable efforts to return the child to the parent, including the requirement for the department to provide a family service plan to the parent, have been waived under Section 262.2015.

TEX. FAM. CODE § 161.001(f); Act of June 12, 2023, 88th Leg., R.S., ch. 675, § 1, 2023 Tex. Gen. Laws 1644, 1644 (codified at TEX. FAM. CODE § 161.001(f)).

Both Mother and Father challenge the factual and legal sufficiency of the evidence to support the trial court's finding that a continuing danger remains in the home that prevents the return of the children. Only Father challenges the sufficiency of the evidence to support the trial court's reasonable-efforts finding.

## 1. Reasonable efforts to return children

The phrase "reasonable efforts to return the child" is not new to the Texas Family Code. *See* TEX. FAM. CODE § 161.001(b)(1)(N) (providing ground for termination if Department proves, among other things, "the department has made reasonable efforts to return the child to the parent"). When a party seeks to terminate the parent-child relationship on the basis of subsection (N), the trial court must find by clear and convincing evidence that, among other things, the Department "has made reasonable efforts to return the child to the parent." *Id.* § 161.001(b)(1)(N). We presume that the legislature enacted section 161.001(f) "with full knowledge of the existing condition of the law and with reference to it." *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677 (Tex. 2007) (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001)) (interpreting statutory factors to

30

comport with common-law factors that statute adopted). Accordingly, judicial interpretation of "reasonable efforts" as used in subsection (N) informs the meaning of "reasonable efforts" in section 161.001(f). *In re P.Y.*, ___ S.W.3d ___, ___, No. 14-25-00696-CV, 2026 WL 363515, at *6 (Tex. App.—Houston [14th Dist.] Feb. 10, 2026, no pet. h.); *In re M.B.*, ___ S.W.3d ___, ___, No. 14-25-00418-CV, 2025 WL 3275376, at *8 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet. h.); *In re M.N.M.*, 708 S.W.3d 321, 328 (Tex. App.—Eastland 2025, pet. denied).

Under subsection (N), creating and implementing a service plan is generally considered a reasonable effort to return a child to his or her parent. *M.N.M.*, 708 S.W.3d at 329; *In re L.E.R.*, 650 S.W.3d 771, 786 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (citing *In re A.M.T.*, No. 14-18-01084-CV, 2019 WL 2097541, at *4 (Tex. App.—Houston [14th Dist.] May 14, 2019, pet. denied) (mem. op.); *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *In re K.G.*, 350 S.W.3d 338, 354 (Tex. App.—Fort Worth 2011, pet. denied)). The Department is required to make "reasonable efforts, not ideal efforts." *In re N.K.T.*, No. 01-16-00439-CV, 2016 WL 6277415, at *8 (Tex. App.—Houston [1st Dist.] Oct. 27, 2016, no pet.) (mem. op.) (quoting *In re S.R.*, No. 12-14-00238-CV, 2015 WL 302493, at *2 (Tex. App.—Tyler Jan. 23, 2015, pet. denied) (mem. op.)).

Here, pursuant to subsection 161.001(f), the trial court found by clear and convincing evidence that "the Department made reasonable efforts to return the children to the parents," which included:

- The Department created a family service plan for Father and Mother that was tailored to address any specific issues identified (i.e. substance abuse evaluations, substance abuse treatment (mother), random drug testing, parenting skills, psychological issues, employment and safe & stable home environment);

- Made referrals for services, provided services (including therapy), and paid for services to address the reasons the children came into care; [and]

- Discussed safe placement options with Mother and Father, however, all provided relatives were not available for safe placement of the children (paternal grandparents are unable to keep the children) . . . .

Father contends that these efforts are not sufficient to constitute "reasonable efforts." He argues that, because these efforts are statutorily required, they cannot be sufficient. *See* TEX. FAM. CODE § 263.101 (requiring filing of service plan); *id.* § 263.102 (prescribing contents of service plan); *id.* § 263.103 (prescribing when and how service plan takes effect).

Father points us to no authority for the proposition that the Department's reasonable efforts must exceed its compliance with statutory requirements. As mentioned, the creation and implementation of a service plan generally constitute reasonable efforts. *N.K.T.*, 2016 WL 6277415, at *8. Father does not explain why or how his service plan was deficient. The service plan stated Father's "NEEDS AND

32

ACTIONS TO ADDRESS," including the Department's concerns regarding "ongoing substance abuse," "domestic violence," unemployment and ability to provide for the children, and use of "illegal substances as a coping mechanism." For each item, the service plan provided a concrete action or set of actions for Father to take. With the exception of Father's unemployment, Father was provided a resource to address each need, including a service center for parenting-skills courses, a facility for drug testing, and a substance-abuse provider. There is factually and legally sufficient evidence to support the trial court's finding that the Department made reasonable efforts to return the children. *See Liu v. Dep't of Fam. & Protective Services*, 273 S.W.3d 785, 795-96 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (concluding evidence of "reasonable efforts" was legally and factually sufficient where Department created a service plan that included recommendations and resources); *N.K.T.*, 2016 WL 6277415, at \*8-10 (same).

Father suggests that the lack of his signature on the service plan makes it defective. However, a service plan "takes effect when" either (1) "the child's parents and the appropriate representative of the department sign the plan" or (2) "the court issues an order giving effect to the plan without the parents' signatures." TEX. FAM. CODE § 263.103(d). Here, on April 1, 2024, the trial court issued an order approving the service plans and giving them effect despite the fact that neither parent had signed his or her service plan. Father's service plan was effective as of that date,

33

notwithstanding that he did not sign it. Furthermore, Father was aware of the service plan because a copy of it was served on him, and the caseworker testified that Father acknowledged he had a copy of it.

### 2. Continuing danger

Both Father and Mother challenge the trial court's continuing-danger findings. Several courts of appeals have considered challenges to the sufficiency of the evidence to support continuing-danger findings and have found relevant that the parent failed to abide by the service plan, continued to test positive for illegal drugs, lived with a domestic partner with a history of drug abuse, and was incarcerated and physically unable to care for the child. *See P.Y.*, 2026 WL 363515, at *7 (noting parent's incarceration); *M.N.M.*, 708 S.W.3d at 332 (same); *In re C.Q.*, No. 03-25-00638-CV, 2026 WL 303008, at *7 (Tex. App.—Austin Feb. 5, 2026, no pet. h.) (mem. op.) (noting parent continued drug use, lived with domestic partner with history of drug abuse, stopped attending therapy, and did not attend another substance-abuse program before termination suit); *In re T.D.-B.*, No. 06-25-00054-CV, 2025 WL 3684457, at *6 (Tex. App.—Texarkana Dec. 19, 2025, pet. filed) (mem. op.) (noting parent continued drug use and was jailed during pendency of case for drug-related charge); *cf. R.R.A.*, 687 S.W.3d at 281 (concluding evidence of endangerment under subsections (D) and (E) was legally sufficient where, among

other things, father had "ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial").

However, neither this Court nor any of our sister courts of appeals appears to have construed the meaning of the phrase "continuing danger" as used in section 161.001(f). Like "reasonable efforts," the term "continuing danger" is not unique to that section. For example, in suits affecting the parent-child relationship in which the Department has been appointed as the temporary or permanent managing conservator of a child, "[a]t each permanency hearing before the final order" the court must order return of the children "unless the court finds, with respect to each parent, that . . . there is a continuing danger to the physical health or safety of the child . . . ." TEX. FAM. CODE § 263.002(c)(1); *see id.* § 262.201(g)(3) (requiring, when certain prerequisites are met, court find at conclusion of adversary hearing "sufficient evidence to satisfy a person of ordinary prudence and caution that . . . reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home"). However, while the use of "reasonable efforts" in subsection (N) closely mirrors the use of that same phrase in section 161.001(f), we are unaware of any provision of the Texas Family Code that uses "continuing danger" in the same manner as it is used in section 161.001(f), particularly under the relevant evidentiary standard: clear and convincing evidence. Section 263.002 applies to interlocutory hearings and does not

state any legal standard pursuant to which the trial court makes its findings. *Id.* § 263.002(c)(1). Section 262.201(g)(3) explicitly applies a lower standard—sufficient evidence to satisfy a person of ordinary prudence and caution—and only requires a "substantial risk of a continuing danger," not a "continuing danger" itself. *Id.* § 262.201(g)(3).

The Department argues that predicate grounds (D) and (E) should inform the meaning of "danger" in section 161.001(f). *See id.* §§ 161.001(b)(1)(D), (E). We agree that the meaning of "endanger" in grounds (D) and (E), each of which have a history of judicial interpretation, informs the meaning of "danger" in section 161.001(f). However, we cannot stop there. Section 161.001(f) requires that the danger (1) be "continuing," (2) "remain[] in the home," and (3) "prevent[] the return of the child to the parent." *Id.* § 161.001(f). We must "presume the Legislature included each word in the statute for a purpose." *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008) (citing *Eddins-Walcher Butane Co. v. Calvert*, 298 S.W.2d 93, 96 (Tex. 1957)). We conclude that, at the least, section 161.001(f) requires that a danger be in existence *and* prevent return of the child. That does not necessarily mean that prior conduct is insufficient to support a finding of a "continuing danger." A parent's prior conduct permits an inference that his endangering conduct will continue in the future. *In re N.J.H.*, 575 S.W.3d 822, 832-33 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (mem. op.) (citing *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—

36

Houston [1st Dist.] 2010, pet. denied); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App—Houston [1st Dist.] 2009, pet. denied)).

Pursuant to section 161.001(f), the trial court made the following specific findings with respect to the existence of a continuing danger despite the Department's reasonable efforts:

- Mother continues to have communication with the Father who is alleged to have committed sexual assault of both children (contact as recently as six weeks prior to trial);

- There are concerns with the Mother's lack of protection of the children in the past and concerns for the future; Mother has stated that she did not think the father would do this; Mother has failed to completed [sic] the Protective Parenting Counseling (virtual on phone) and Child Sexual Abuse Education; she was unsuccessfully discharged, after missing 4 sessions[;]

- There are concerns with the mother's sobriety; Mother was told not to dye her hair; however, it was dyed; the Department has requested drug testing multiple times, and mother has not had random drug screening since May 2025; and

- The children have ongoing therapy and medical needs which need to be addressed – mental health and physical needs ([Richard's] are significant); there are concerns as to the ability of the mother to address these issues;

- The mother does not have housing for the children, although she may be able to be placed elsewhere[;]

- Father has done nothing to rectify the situation or to complete services; [and]

37

- Father is incarcerated on the charges of continuous sexual abuse of the children and due to the serious allegations of sexual abuse constitutes a danger to the children.

With respect to Father, he challenges the incarceration finding as inaccurate and lacking evidentiary support. He contends that he was "arrested on a warrant for sexual assault of a child." It is unclear whether Father contends that the term "incarcerated" is inaccurate or merely that the stated basis for his incarceration was inaccurate. Either way, it is undisputed that Father was jailed at the time of trial. The trial court also heard testimony from the arresting officer, who stated that he arrested Father pursuant to a warrant for sexual assault of a child. We conclude that the record supports the trial court's incarceration finding.

Additionally, the trial court found that Father did not complete the services outlined in the service plan. Where there is sufficient evidence of endangerment under subsections (D) and (E), Father's failure to engage in *any* services to remediate the endangering conditions permits the inference that Father will continue to engage in endangering conduct in the future and, thus, supports the existence of a continuing danger. *See N.J.H.*, 575 S.W.3d at 832-33 (holding that parent's violent criminal history permitted inference that violent behavior would continue in future and supported termination under ground (E)). This failure coupled with Father's incarceration supports the trial court's continuing-danger finding.

With respect to Mother, she argues that the evidence is insufficient to support the trial court's continuing-danger findings or that, in the alternative, those findings do not constitute a "continuing danger." The trial court found that Mother continued communicating with Father, failed to complete a protective parenting course, stated she did not think Father would commit sexual abuse of the children, and had not submitted to a drug test since May 2025.

Regarding Mother's continued communications with Father, the evidence in the record shows two phone calls and one Facebook post. In the first call, Father called Mother when placed under arrest, and he made the call using the arresting officer's phone, not from any number Mother could have identified. The call was brief and ended with them each telling the other "I love you." As to the second phone call, there is no evidence of the contents of that communication. Lastly, the Facebook post, which was admitted without any accompanying testimony, states: "I hope your [sic] starting to feel better and are starting to get back to your healthy self [sic] me and the boys love you. Hope you now see that you deserve better and a better life." There was no other evidence of communication between Mother and Father. Additionally, there was no evidence that Mother and Father had any face-to-face meetings outside of court appearances. Father did not attend any visitations with Mother, and Mother testified that she does not have a relationship with Father.

It is undisputed that Mother failed to complete a protective parenting course, which the Department requested of her following the children's allegations of sexual abuse by Father, and which the trial court ordered Mother to complete. The "treatment plan" for the course included the following issues to be addressed: (1) "improve understanding of child abuse and neglect" and (2) "improve protective factors to prevent child abuse and neglect." The caseworker testified that the Department requested this course after Mother told the caseworker that "she didn't think [Father] would do" the conduct alleged by the children. Although Mother began the course, she did not complete it and was discharged due to missing too many appointments. Mother testified that she did not realize that asking to reschedule too many appointments would result in her being discharged. In contrast, the caseworker testified that the course's service provider informed Mother that the provider's policy was that Mother should not miss more than two appointments. As the factfinder, the trial court was free to credit the caseworker's testimony and disbelieve Mother's explanation. *See In re J.W.*, 645 S.W.3d 726, 745 (Tex. 2022) (noting that factfinder evaluates witness credibility and appellate court may not reweigh evidence). The caseworker further testified that the protective parenting course was virtual and telephonic, and Mother never reported difficulty maintaining a phone or Internet access. These facts were undisputed at trial. Mother's failure to complete a course designed to improve her understanding of child abuse and increase

protectiveness supports the trial court's continuing-danger finding that "[t]here are concerns with the Mother's lack of protection."

It is also undisputed that Mother's last drug test was in May 2025. There was no evidence as to the number of missed tests or the Department's requests. Mother continued to reside in a sober-living home and continued to see the children after May 2025. However, Mother also began bleaching and dyeing her hair. Mother's service plan specifically stated that "[f]ailing to submit to a drug screen" or "chemically altering hair . . . will be considered a positive result," and the caseworker testified that dyeing or bleaching hair interferes with hair-follicle samples used in drug testing. Mother's failure to appear for a drug test in the four months prior to the close of trial supports the trial court's continuing-danger finding that "[t]here are concerns with the mother's sobriety." *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting that factfinder could reasonably infer that parent's failure to submit to court-ordered drug screening indicated parent was avoiding testing due to ongoing drug use).

The evidence is legally and factually sufficient to support the trial court's findings that Mother lacks protectiveness and is presumptively not sober. These findings, in turn, satisfy subsection (f)'s requirement that the Department prove by clear and convincing evidence that a continuing danger "remains in the home that prevents the return of the child to the parent." TEX. FAM. CODE § 161.001(f); *see*

*T.D.-B.*, 2025 WL 3684457, at *6 (finding "no error in the trial court's Section 161.001(f) finding" where father had history of drug use and had presumptively positive drug test results).

**D.      Children's Best Interest**

Mother and Father contend that the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights was in Timothy's and Richard's best interest. *See* TEX. FAM. CODE § 161.001(b)(2) (requiring that trial court find that termination is in best interest of child). There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). However, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a). Because of the strong presumption in favor of maintaining the parent-child relationship and the due-process implications of terminating parents' rights to their minor children without clear and convincing evidence, "the best interest standard does not permit termination merely because a child might be better off living elsewhere." *In re J.G.S.*, 574 S.W.3d 101, 121-22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (citation modified). Additionally, in a parental-rights termination suit, the Department bears the burden of proving, by clear and

42

convincing evidence, that the parents should no longer have any relationship with the children whatsoever. *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.); *In re J.A.J.*, 243 S.W.3d 611, 616-17 (Tex. 2007)).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on each factor to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *D.R.A.*, 374 S.W.3d at 533. Moreover, evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d

17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best-interest finding).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and protection from repeated exposure to violence even though the violence may not be directed at the child; and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b); *R.R.*, 209 S.W.3d at 116.

As a preliminary issue, Father argues that the legislature's recent amendments to section 153.002 of the Texas Family Code supersede the *Holley* factors. TEX. FAM. CODE § 153.002. In 2025, the legislature amended section 153.002 to include two rebuttable presumptions that (1) "a parent acts in the best interest of the parent's

child" and (2) "it is in the best interest of a child to be in the care, custody, and control of a parent." *Id.* § 153.002(b); *see* Act of May 28, 2025, 89th Leg., R.S., ch. 236, § 2, sec. 153.002, 2025 Tex. Sess. Law. Serv. Ch. 236 (codified at TEX. FAM. CODE § 153.002). A nonparent may only overcome these presumptions by "proving by clear and convincing evidence that denial of the relief requested by the nonparent would significantly impair the child's physical health or emotional development." *Id.* § 153.002(c). Father contends that section 153.002's significant-impairment test supersedes the *Holley* factors in a parental-rights termination suit. However, section 153.002 of the Texas Family Code "only applies to cases involving ongoing conservatorship and possession rights, neither of which are implicated in a parental-rights termination case." *In re K.D.*, 471 S.W.3d 147, 166 (Tex. App.—Texarkana 2015, no pet.); *see In re Morris*, 498 S.W.3d 624, 630-34 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding [mand. denied]) (noting that chapter 153 of Texas Family Code governs "suits for conservatorship, possession, and access to children" and holding that, in absence of clear language to contrary, a provision in chapter 153 did not apply to termination suits under chapter 161 of Texas Family Code). Accordingly, regardless of whether the recent amendments to section 153.002 supersede the *Holley* factors, that section does not apply here.

### 1. Children's desires and needs

At the time of the first day of trial, July 21, 2025, Father had not seen Timothy or Richard since February 2024. The caseworker testified that the children did not want to visit Father. The children's court-appointed advocate testified that the children "continually say that they do not want to go back . . . . [T]hey don't want to go through the physical and sexual abuse anymore . . . ."

As for Mother, the evidence of the children's desires is mixed. At trial, the caseworker read aloud from the children's therapist's notes. In therapy, Richard, the younger child, consistently told his therapist he wants to live with Mother and that he misses her. In a September 28, 2024 therapy session, Timothy told his therapist that he did not want to return to Mother. In that same session, according to the therapist's notes, she "assured" Timothy that "he would not be going home," and if he left his current foster mother, he would be placed in "another foster home, not his mother's." The caseworker testified that she did not think the therapist's comments to Timothy were appropriate. The caseworker testified that the children's statements in the notes that she read into the record were not said to her by the children. The forensic interviewer testified that, when she met with Timothy in June 2025, he was scheduled for a visit with Mother and "wanted to make sure that he got there." At the same time, Timothy told the interviewer that there were instances of Mother

hitting him and "there was a lot more that he wanted to tell" the interviewer, but he did not want to be late to the visit with Mother.

With respect to Father, this factor weighs in favor of termination. Although the children did not appear to directly state their desires regarding a continued parent-child relationship with Father, the only evidence in the record regarding their desires is that they do not want to see Father or return to living with him. As for Mother, this factor is inconclusive. The children's therapist's notes are some evidence in the record of the children's desires; those therapy sessions were conducted more than eight months before the second day of trial, and those references are mixed as the children's expressed desires changed over time. However, the children's court-appointed special advocate testified that the children "continually" told him that they do not want to return to Mother, despite enjoying their visits with her. The trial court could have relied on this testimony to conclude that the children did not desire to live with their Mother or return to her care. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam) (noting that factfinder is sole arbiter of witness credibility).

### 2. Children's environment, needs, and dangers and parents' abilities

Proof of a parent's acts or omissions under section 161.001(b)(1) may be probative of the children's best interest. *C.H.*, 89 S.W.3d at 28. A parent's substance abuse supports a finding that termination is in the best interest of the child. *In re*

*E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting factfinder can give "great weight" to "significant factor" of drug-related conduct); *In re Z.H.*, No. 14-19-00061-CV, 2019 WL 2632015, at *6 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (mem. op.) (considering parent's drug use in context of evaluating present and future emotional and physical danger to child).

Here, Father's and Mother's parental rights were terminated under grounds (D) and (E). TEX. FAM. CODE §§ 161.001(b)(1)(D), (E). Father and Mother endangered Timothy and Richard by failing to provide a stable home and exposing them to sexual and drug abuse. Father also subjected the children and Mother to physical abuse. Father admitted his drug use prior to removal, and he failed to demonstrate his sobriety during the pendency of the case. Timothy also alleged sexual abuse by Father.

Despite these conditions, which caused the children to enter the Department's care, Father showed virtually no interest in improving. During the pendency of the case, he appeared for only two drug tests, both of which returned positive for illegal substances. He completed no services, such as a substance-abuse program or parenting-skills courses, both of which were included in Father's service plan. Finally, at the time of trial, Father was incarcerated under pending charges of sexual abuse of a child. There is no evidence in the record that Father has the means to meet

the emotional and physical needs of Timothy and Richard. Moreover, Father's pre- and post-removal conduct permits an inference that his endangering conduct will continue in the future. *In re N.J.H.*, 575 S.W.3d 822, 832-33 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App—Houston [1st Dist.] 2009, pet. denied)).

As for Mother, she does not challenge the trial court's findings under subsections (D) and (E), and she shares responsibility for the conditions prior to the children's removal. The children made allegations to their therapist and the forensic interviewer that Mother hit them at times, that she failed to protect them from the physical abuse of Father, and that she and Father exposed the children to "drug houses" and instances of her and Father's having sex with strangers. Although Mother showed substantial improvement by the time of trial, she failed to complete a parenting-skills course. Mother completed an inpatient substance abuse program and continued to attend Alcoholics Anonymous and Narcotics Anonymous, and all her random drug screenings returned negative; however, at the time of trial, Mother had not completed a drug screening since May 2025, and she had dyed her hair despite admonishments from the caseworker. The caseworker testified that dyeing or bleaching hair interferes with hair-follicle samples used in drug testing. Per the

49

terms of her service plan, Mother's failure to appear for drug screenings and refrain from dyeing her hair result in presumptively positive test results and cast doubt on her sobriety. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting that factfinder could reasonably infer that parent's failure to submit to court-ordered drug screening indicated parent was avoiding testing due to ongoing drug use).

As evidence of Mother's poor parenting skills, the Department relies on statements in the children's therapist's notes that Mother told the children to "destroy" their foster mother's home. The therapist did not testify at trial, but the caseworker read a portion of these notes into the record, including the statement that Mother told the children to "destroy" their foster mother's home. The caseworker's testimony casts doubt on the veracity of this allegation. After she picked up the children from the visit, the children spoke of the visit, but "these things [the allegations in the therapist's notes] were not said to me. . . . What you had me read were not said to me." Nonetheless, for purposes of our review, we assume that the trial court resolved the disputed evidence to find that Mother did make this statement. *Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 249-50 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

The Department also raised concerns regarding Mother's lack of protectiveness of the children. In support of the lack of protectiveness, the

50

Department pointed not only to past conduct but also the fact that Mother continued to speak with Father. We addressed this evidence in our discussion of the trial court's continuing-danger findings. The Department argued, and the trial court found, that a continuing danger remained in Mother's home because she continued to communicate with Father. Mother testified that she does not have a relationship with Father, and she intends to keep the children away from him if they are returned to her custody. The only evidence of continued communication was two brief phone calls and a Facebook post. This evidence alone does not support Mother's lack of protectiveness. However, in light of the children's sex-abuse allegations against Father, the Department requested that Mother complete a protective parenting course, which she failed to do. The course was virtual and telephonic, yet Mother failed to attend the sessions and was discharged from the course. Additionally, even if the sex-abuse allegations were untrue, Mother admitted that Father had hit her and that the children needed protection from him. Her failure to complete the protective parenting course coupled with the history of domestic violence supports an inference that endangering conduct will continue in the future. *N.J.H.*, 575 S.W.3d at 832-33 (noting that a parent's prior conduct permits an inference that her endangering conduct will continue in the future).

### 3.     Plans for children and stability of home or placement

Permanence and stability are paramount factors when considering whether termination is in the children's best interest. *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.); *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The caseworker testified that Timothy and Richard are doing "pretty good" in their foster placement and that the placement meets all their needs. However, the foster parents do not plan to adopt the children. The Department's plan for permanent placement is an unrelated adoption outside the current foster home, but no prospective adoptive parents have been identified. Of the relatives identified by the Department—two grandparents and a great aunt—none is willing and able to take the children.

Father is incarcerated, and the record reveals no plans Father has for the children. There is no record evidence that Father has requested to see the children or desires to see them. He told the caseworker that he has a home, but there is no evidence of its existence or condition. He refused to allow the caseworker to visit his residence.

Mother has a stable home, although her current residence does not allow children. Her previous residence allowed children but closed due to funding cuts, causing her to move shortly before trial. Mother informed the caseworker that she changed homes and the reasons for the move. The children visited Mother one to

two times per month at her residence. Mother never missed a visitation, but some visits were rescheduled depending on Mother's work schedule. According to the caseworker, her visits with Timothy and Richard went "really good." Mother testified that she would take the children to medical and dental appointments, but she had not identified specific doctors or dentists. At trial, Mother testified that she is employed, her job offers daycare benefits, and her manager is "very flexible."

These factors weigh in favor of termination of Father's parental rights. Although the Department has not identified a specific permanent placement for the children, Father has no plan for the future of the children and has not demonstrated that he can provide them a safe, stable environment. As for Mother, these factors are neutral. Her home is stable, but her residence—a self-managed sober-living facility—does not allow children, which would require her to move again in the future if they were to live with her. That would be her third move in less than a year, and at the time of trial, she had not identified a new residence. However, the Department, having failed to identify a prospective adoptive family, also lacks a permanent plan for the children. *See In re K.N.J.*, 583 S.W.3d 813, 826-27 (Tex. App.—San Antonio 2019, no pet.) (concluding that absence of permanent plan from mother and Department did not "support a finding that terminating [mother's] parental rights is in the children's best interest"); *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 248 (Tex. App.—Houston [1st Dist.] 2006, no

pet.) (concluding that Department's lack of plans for permanent home "weighs against termination").

### 4.     Overall best-interest conclusion

Considering all the evidence presented at trial, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of parental rights was in the children's best interest. Father has failed to demonstrate any improvement since the Department's removal of the children. As to Mother, we recognize her record of positive visits with the children and substantial progress toward sobriety and stable living conditions. However, she does not contest that she endangered her children, and she failed to complete a protective parenting course, a requirement of her service plan designed to address one of the Department's primary concerns: Mother's lack of protectiveness of the children. Mother also failed to demonstrate that she remained sober, and the Department introduced evidence of Mother's failure to attend drug tests and refrain from dyeing her hair, which interferes with hair-follicle drug testing. *See In re D.R.A.*, 374 S.W.3d 528, 532-37 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (concluding evidence was legally and factually sufficient to support best-interest finding where child's placement was stable, father lived with his mother, father tested positive on one drug test, and father failed to comply with "significant aspects of the family plan," including parenting classes); *D.M.*, 452 S.W.3d at 470-74 (Tex. App.—San Antonio 2014, no pet.)

(concluding evidence was legally and factually sufficient to support best-interest finding where mother had history of drug use and incarceration and there were concerns of mother relapsing given past relapses, despite mother's recent positive history of sobriety).

**Ineffective Assistance of Counsel**

In Father's second issue, he contends that the trial court erred in terminating his parental rights because he received ineffective assistance of counsel and suffered irreparable harm. Father asserts that his trial counsel did not render effective assistance because she did not (1) object to the children's hearsay statements to which others testified, (2) serve a subpoena on the children's therapist for records and testimony, (3) solicit rebuttal testimony from Father, or (4) file a motion for new trial.

**A.    Standard of Review and Applicable Law**

When a governmental entity, including the Department, seeks termination of the parent-child relationship or appointment of a conservator, indigent parents opposing the termination or appointment have a statutory right to counsel. TEX. FAM. CODE § 107.013(a). That statutory right "embodies the right to effective counsel." *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). We review ineffective-assistance-of-counsel claims in parental-rights termination proceedings, as in criminal cases, under the two-part *Strickland* test. *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021) (citing

55

*Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under *Strickland*, a party must show that: (1) "counsel's performance was deficient" and (2) "counsel's errors were so serious as to deprive the [party] of a fair trial, a trial whose result is reliable." *Id.* (quoting *Strickland*, 466 U.S. at 687).

In evaluating the first prong, "we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a reasonably effective manner." *Id.* (citation modified). Counsel's conduct must be "so grossly deficient as to render proceedings fundamentally unfair." *Id.* (quoting *M.S.*, 115 S.W.3d at 545). "[W]e must give great deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 689). The challenged conduct must be "so outrageous that no competent attorney would have engaged in it." *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). When the record is silent concerning counsel's reasons, we "may not speculate to find counsel ineffective." *P.W. v. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 478 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.) (citing *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)); *In re M.T.R.*, 579 S.W.3d 548, 574 (Tex.

App.—Houston [14th Dist.] 2019, pet. denied); *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *P.W.*, 403 S.W.3d at 476).[4]

Under *Strickland*'s second prong, we must consider "whether 'there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.'" *M.S.*, 115 S.W.3d at 550 (quoting *Garcia*, 57 S.W.3d at 440; and citing *Strickland*, 466 U.S. at 687). "A reasonable

---

[4] As noted, the *Strickland* test is the same in both criminal cases and parental-rights termination suits. *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Because the record must demonstrate the merit of an appellant's ineffective-assistance claim, "[d]irect appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App.1999)). However, while criminal defendants are "provided an avenue of adequate relief through a writ of habeas corpus if trial counsel was ineffective . . . parents [in parental-rights termination suits] . . . who allege ineffective assistance of counsel apparently have no recourse other than direct appeal by which to overturn the trial court's judgment severing forever the ties with their children." *In re D.A.R.*, 201 S.W.3d 229, 230-31 (Tex. App.—Fort Worth 2006, no pet.) (citation modified). We are not the first court of appeals to note the discrepancy in remedies available to criminal defendants and parents appealing termination of their parental rights. *See id.* (noting lack of habeas remedy in parental-rights termination suits); *In re C.S.*, No. 13-13-00095-CV, 2013 WL 3895818, at *9 n.8 (Tex. App.—Corpus Christi–Edinburg July 25, 2013, no pet.) (mem. op.) (same). Nonetheless, we are bound by this Court's prior precedents that we "may not speculate to find counsel ineffective" when the record is silent. *P.W. v. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 478 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.) (citing *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)); *see Mitschke v. Borromeo*, 645 S.W.3d 251, 257 (Tex. 2022) ("[T]hree-judge panels must follow materially indistinguishable decisions of earlier panels of the same court unless a higher authority has superseded that prior decision.").

probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Father bears the burden of "demonstrating a reasonable probability that he would have been awarded custody of [the children] save for his trial counsel's ineptness." *In re V.V.*, 349 S.W.3d 548, 560 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

## B.    Analysis

### 1.    Hearsay statements

Father contends that his trial counsel rendered ineffective assistance when she failed to object to hearsay statements made by the children or, at the least, when she failed to request the trial court make the required findings under section 104.006 of the Texas Family Code for admission of the statements. *See* TEX. FAM. CODE § 104.006 (stating that certain otherwise inadmissible hearsay statements by child regarding abuse are admissible if trial court makes findings regarding statements' reliability). Specifically, Father complains that Keever's testimony reciting prior, out-of-court statements made by Timothy was inadmissible hearsay.

Because the record is silent as to Father's trial counsel's reasons for not objecting to these statements, we cannot speculate to find counsel ineffective. *P.W.*, 403 S.W.3d at 478. Even assuming that counsel's performance was deficient, Father must show harm to prevail on his ineffective-assistance claim. In addition to Keever's testimony—of which Father complains—the trial court also heard the

testimony of the children's caseworker, who also read into the record notes from the children's therapist. In the therapist's notes, which the trial court admitted without objection, she recorded the children's physical- and sexual-abuse allegations. Father also testified to his drug use following the children's removal. Thus, Keever's complained-of testimony regarding the abuse allegations and Father's drug use is cumulative of other evidence in the record that was admitted without objection. *M.T.R.*, 579 S.W.3d at 570 (concluding that parent was not harmed by hearsay evidence because there was "evidence identical or similar to the objected-to evidence" (citing *In re R.H.W. III*, 542 S.W.3d 724, 740 (Tex. App.—Houston [14th Dist.] 2018, no pet.)); *In re B.K.G.D.*, No. 01-20-00057-CV, 2020 WL 3821086, at *15 (Tex. App.—Houston [1st Dist.] July 2, 2020, pet. denied) (mem. op.) (holding that inadmissible hearsay was not harmful because it was cumulative of admissible evidence).

Additionally, had Father's trial counsel objected to the children's hearsay statements to which Keever testified, it would have been proper for the trial court to admit such statements. Under section 104.006 of the Texas Family Code:

> In a suit affecting the parent-child relationship, a statement made by a child 12 years of age or younger that describes alleged abuse against the child, without regard to whether the statement is otherwise inadmissible as hearsay, is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and:

(1) the child testifies or is available to testify at the proceeding in court or in any other manner provided for by law; or

(2) the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.

TEX. FAM. CODE § 104.006. Because Timothy and Richard were eleven and five years old, respectively, at the time of trial, they were under the age of twelve when the statements were made. The statements to which Keever testified "describe[d] alleged abuse" against the children. *Id.* Had a hearing been requested under section 104.006,[5] the trial court could have found that the hearsay statements were sufficiently reliable and that the children were available to testify. There is no indication in the record that the children were unavailable, and nothing in the record suggests that any party requested their testimony or objected to their absence.

Father also contends that his trial counsel should have called at least Timothy as a trial witness. The decision to call or not to call a witness to testify typically falls

---

[5] The Fort Worth court of appeals has suggested that the requirements of section 104.006 are mandatory and are analogous to article 38.072 of the Texas Code of Criminal Procedure, which governs admissibility of hearsay statements by child-abuse victims. *In re K.L.*, 91 S.W.3d 1, 16 (Tex. App.—Fort Worth 2002, no pet.). We previously held that trial counsel rendered ineffective assistance when counsel failed to object to hearsay statements and trigger article 38.072's mandatory hearing requirements, even though the record was silent regarding counsel's reasoning. *Lopez v. State*, 315 S.W.3d 90, 98-100 (Tex. App.—Houston [1st Dist.] 2010), *rev'd*, 343 S.W.3d 137 (Tex. Crim. App. 2011). The Texas Court of Criminal Appeals reversed that decision on the grounds that the record was silent, and therefore, we could not speculate as to counsel's reasons for not objecting. *Lopez*, 343 S.W.3d at 143 ("When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined.").

within counsel's reasonable professional assistance. *See, e.g.*, *In re M.T.R.*, 579 S.W.3d at 575 (concluding that counsel did not render ineffective assistance by failing to call mother's boyfriend, who had long criminal record, to testify); *In re L.P.*, No. 09-19-00421-CV, 2020 WL 7062328, at *10 (Tex. App.—Beaumont Dec. 3, 2020, pet. denied) (mem. op.) ("Since strategy plays a large role when deciding whether to call a witness to testify in a trial, decisions in trials over whether to call a witness to testify in the trial are not usually sufficient to prove a claim of ineffective assistance of counsel . . . ."); *In re K.D.*, 202 S.W.3d 860, 867 (Tex. App.—Fort Worth 2006, no pet.) (holding that trial court's denial of ineffective-assistance claim was not abuse of discretion even where trial counsel failed to call any witnesses). Here, trial counsel could have concluded that Timothy's live testimony would have been prejudicial and that trial counsel could better attack the child's credibility through other evidence in the record, such as the therapist's notes, which were admitted and are discussed below.

### 2. Subpoena to therapist

Father contends that his trial counsel rendered ineffective assistance by failing to serve a subpoena on the children's therapist to compel her trial testimony and production of records. Father complains that the therapist could have provided testimony undermining the children's credibility because the therapist's records suggested that she believed the children to be "chronic liars."

There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *M.S.*, 115 S.W.3d at 549. A decision not "to call a witness to testify in the trial" is "not usually sufficient to prove a claim of ineffective assistance of counsel." *L.P.*, 2020 WL 7062328, at *10. Here, Father's trial counsel could have concluded that the therapist's live testimony would have been prejudicial. The trial court already admitted the therapist's notes, which recorded the children's physical- and sexual-abuse allegations against Father. Those same records also included the therapist's notes that both children had difficulty telling the truth. Father's trial counsel could have concluded that the available records were sufficient in lieu of the therapist's live testimony or that live testimony or further records would only have been prejudicial.

Even if we concluded that trial counsel erred by not compelling the therapist's testimony, Father has not demonstrated harm. The trial court admitted the therapist's records and allowed the children's caseworker to read portions aloud at trial. For example, the caseworker read portions of the therapist's notes of a January 13, 2025 session with Richard, in which the therapist stated, in part: "[Richard] is becoming what [the foster mother] and the therapist calls [sic] a chronic liar. It seems as if he does not think before he responds when being questioned about any one thing and most often lying because he does responds [sic] without thinking. It has become increasingly more difficult for the therapist and his foster mother to determine when

[Richard] is lying or when he is telling the truth." Regarding a December 18, 2024 session with Timothy, the therapist wrote—and the caseworker read into the record at trial—that "[t]he therapist used addressed [sic] the issue of what appears to be [Timothy's] telling untruths/lying because it appears to be escalating. . . . The therapist will be recommending that [Timothy's] foster mother keep track of how much [Timothy] lies in the course of the day." The lack of the therapist's live testimony did not deprive Father of presenting evidence concerning the therapist's assessment of the children's credibility.

### 3.    Father's testimony

Father complains that his trial counsel did not solicit any testimony from him rebutting the abuse allegations against him. As with the children's testimony, Father's trial counsel could have made a strategic decision not to ask Father questions concerning the abuse allegations. There is nothing in the record to suggest that "any positive result would have been served" by trial counsel asking Father to rebut the abuse allegations against him. *See In re K.S.*, 420 S.W.3d 852, 857 (Tex. App.—Texarkana 2014) (rejecting ineffective-assistance claim on appeal where father could not show harm by failure of counsel to call him to testify). Additionally, those allegations are the subject of a criminal charge pending at the time of trial for which Father was arrested. Father's trial counsel could have concluded that it was in Father's interest to remain silent and preserve his Fifth Amendment right against

63

self-incrimination. *See Ex parte Butler*, 522 S.W.2d 196, 197-98 (Tex. 1975) (noting that, in a civil case, witness can assert Fifth Amendment on question-by-question basis and testifying does not waive the privilege).

### 4. Motion for new trial

Lastly, Father complains that his trial counsel rendered ineffective assistance of counsel by not filing a motion for new trial. Father contends that, by not filing such a motion, trial counsel prejudiced his defense, precluding him from arguing on appeal that the Department abandoned certain grounds for termination of his parent-child relationship with Timothy and Richard. *See In re I.L.*, 580 S.W.3d 227, 244 (Tex. App.—San Antonio 2019, pet. dism'd) (noting that filing a motion for new trial is required for appellate review of judgment granting unrequested relief (citing *M.S.*, 115 S.W.3d at 549)); TEX. R. APP. P. 33.1(a) (requiring that, generally, a party must complain to trial court first to preserve complaint for appellate review).

Whether trial counsel's decision not to file a motion for new trial was objectively unreasonable depends on whether the complaint has merit. *I.L.*, 580 S.W.3d at 244. In arguing harm, Father relies on *D.V. v. Texas Department of Family & Protective Services*, 722 S.W.3d 854 (Tex. 2025). In *D.V.*, the Texas Supreme Court held that the Department abandoned its request for termination of the parent-child relationship where the Department's representative testified that the Department did not seek termination and the Department did not correct or rebut that

testimony. *Id.* at 861-62. In contrast, here, Father does not contend that the Department abandoned its request for termination. Rather, he argues that the Department abandoned certain bases to support any finding that termination was in the children's best interest.

When asked why termination of Father's parent-child relationship was in the best interest of both children, Warren—the children's caseworker and the Department's representative—testified, "The reason why we're asking that the rights are terminated is because . . . [Father] has not done any services whatsoever." Father contends that Warren's failure to identify other reasons in response to this question means that no other reasons can support the trial court's best-interest findings. We disagree. Unlike in *D.V.*, the Department here did not abandon its request for termination. *See id.* at 859 (noting that Department's representative confirmed that Department was "not seeking to terminate [Mother]'s rights"). Additionally, the Department did not explicitly repudiate any bases to support a best-interest finding. Father relies on omissions in response to a single question rather than affirmative statements in the record. Elsewhere in the record, Warren testified to the Department's concerns regarding Father. Warren testified that the Department was concerned about the parents' neglectful supervision, the sex-abuse allegations against Father, and Father's failure to rectify the conditions that caused the children's removal. Because Father does not carry his burden to establish a

reasonable probability that he would have avoided termination but for his counsel's failure to file a motion for new trial, we conclude he has not shown that his counsel's failure to file such a motion prejudiced his defense.

## Managing Conservatorship

Mother contends that the trial court erred in naming the Department as permanent managing conservator of Timothy and Richard. Because we have overruled Mother's challenges to the portion of the trial court's order terminating her parental rights, the trial court's order has divested Mother of her legal rights and duties related to both children. *See* TEX. FAM. CODE § 161.206(b) ("[A]n order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other . . . ."). When, as here, we affirm the trial court's termination of parental rights, the parent lacks standing to challenge the trial court's appointment of a conservator. *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *In re R.J.*, 579 S.W.3d 97, 120 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *In re A.F.S.*, No. 01-18-00457-CV, 2018 WL 5539486, at *5 (Tex. App.—Houston [1st Dist.] Oct. 30, 2018, no pet.) (mem. op.) (noting that "appealing party cannot complain of errors that do not harm her or that affect only the rights of others"). Because Mother lacks standing, we overrule her challenge to the Department's appointment as permanent managing conservator.

## Constitutionality of Parental-Rights Termination

Lastly, Father contends that termination of his parental rights must satisfy strict scrutiny. He argues that the parent-child relationship cannot be terminated unless termination is the least restrictive means to satisfy a compelling governmental interest. If less-restrictive alternatives are available, termination does not survive strict scrutiny.

To preserve a complaint for appellate review, the record must show, among other things, that the party timely complained to the trial court and "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a). Nothing in the record demonstrates that Father complained to the trial court either before or after the final order that termination must satisfy strict scrutiny. Accordingly, this issue is not preserved for our review. *See In re Z.D.*, No. 05-25-00138-CV, 2025 WL 2211477, at *9 (Tex. App.—Dallas Aug. 4, 2025, pet. denied) (mem. op.) (holding that parent must complain to trial court first to preserve argument that termination must satisfy strict scrutiny); *In re L.M.I.*, 119 S.W.3d 707, 710-11 (Tex. 2003) (concluding that parent in parental-rights termination suit failed to preserve constitutional due-process complaint where not raised in trial court).

We recognize that the constitutional provision on which Father relies did not yet exist when the trial court issued the final order terminating his parental rights. As Father notes, on November 4, 2025—after entry of the final order and the same day he filed his notice of appeal—the Texas Constitution was amended to add section 37 to article I, which reads:

> To enshrine truths that are deeply rooted in this nation's history and traditions, the people of Texas hereby affirm that a parent has the responsibility to nurture and protect the parent's child and the corresponding fundamental right to exercise care, custody, and control of the parent's child, including the right to make decisions concerning the child's upbringing.

TEX. CONST. art. I, § 37. Although the constitutional amendment is new, our state's recognition of a parent's "fundamental right to exercise care, custody, and control" is not. Section 37's text tracks the language of our jurisprudence. Prior to section 37's adoption, the Texas Supreme Court has long recognized that parents have the "fundamental right to make decisions concerning 'the care, the custody, and control of their children.'" *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014) (quoting *Troxel v. Granville*, 530 U.S. 57, 65, (2000); and citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). Section 37 "affirm[s]" that right. Even before Section 37's adoption, Father could have raised his constitutional complaint in the trial court.

Moreover, even if this complaint was preserved for our review, we conclude that existing protections sufficiently safeguarded Father's constitutional rights, and we decline to apply a strict-scrutiny review to the trial court's termination order.

When deciding whether a statute or the state's conduct unduly infringes on the fundamental rights of parents, the supreme court has never applied strict scrutiny. *See In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (avoiding determination of which standard applied and concluding "because the facts here are virtually the same [as in *Troxel*], the judgment must be the same too"); *In re C.J.C.*, 603 S.W.3d 804, 814 n.49 (Tex. 2020) (same); *In re H.S.*, 550 S.W.3d 151, 175 (Tex. 2018) (Blacklock, J., dissenting) ("While the Supreme Court has broadly recognized the constitutional interest of parents in the care, custody, and control of their children, the Court has not articulated a standard of review by which to judge the constitutionality of infringements upon parents' rights."). In any event, the best-interest analysis necessarily implicates whether termination of the parent-child relationship is the least-restrictive means to accomplish the compelling governmental interest in protecting the children. *See In re M.B.*, ___ S.W.3d ___, ___, No. 14-25-00418-CV, 2025 WL 3275376, at *16 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet. h.) ("Mother's argument that termination was not the least restrictive solution or was not narrowly tailored is considered in various factors of the best-interest analysis."); *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 139 (Tex. App.—El Paso 1997, no writ) ("[T]he requirement to show that the termination is in the best interest of the child coupled with the clear and convincing standard of proof . . . guarantees the constitutionality

69

of termination proceedings. A separate consideration of alternatives to termination is not required."), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002); *cf. In re S.H.A.*, 728 S.W.2d 73, 91 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (noting that "severance of the parent-child relationship will survive constitutional scrutiny only if . . . it is impossible to achieve the goal through any less restrictive means"). In addition, in suits brought by the Department, as here, courts generally "may not order termination . . . unless the court finds by clear and convincing evidence" that "the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent . . . ." TEX. FAM. CODE § 161.001(f). Because the best-interest analysis and clear-and-convincing-evidence standard "guarantee[] the constitutionality of termination proceedings," *Edwards*, 946 S.W.2d at 139, we decline to apply a separate strict-scrutiny review to a final order terminating parental rights.

## Conclusion

We affirm the trial court's order.

Amparo "Amy" Guerra
Justice

70

Panel consists of Chief Justice Adams and Justices Guerra and Guiney.